IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:09CR111 |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| BRANDON J. COLE, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress (Filing. No. 20) filed by the defendant, Brandon J. Cole (Cole). Cole is charged in the Indictment with receiving child pornography (Count I) in violation of 18 U.S.C. § 2252(A)(a)(2); with the possession of child pornography (Count II) in violation of 18 U.S.C. § 2252(a)(4)(B); and with a forfeiture of various computer equipment (Count III) pursuant to 18 U.S.C. § 2253. Cole seeks to suppress the evidence derived from the warrantless search of several of his computers and any statements made by Cole to Nebraska State Patrol (NSP) investigators on October 7, 2008.

Evidentiary hearings were held on Cole's motion on June 29, 2009, and July 24, 2009. Cole was present during the hearings along with his appointed counsel, Assistant Federal Public Defender Jeffrey L. Thomas. The United States was represented by Assistant U.S. Attorney Michael P. Norris. During the hearing on June 29, 2009, the court heard the testimony of NSP Investigator Kent Hanlin (Investigator Hanlin). On July 24, 2009, the court heard the testimony of Thurston County Sheriff's Office (TCSO) Sergeant Deputy Sheriff Shelly Perez (Sergeant Perez) and Sheriff Chris Kleinberg (Sheriff Kleinberg). The court also received into evidence two consent forms (Exhibits 1 and 2) and an application and affidavit for issuance of a search warrant (Exhibit 3). A transcript of the hearing (TR.) was filed on August 4, 2009. **See** Filing No. 30. The matter was deemed submitted upon filing of the transcript.

## FINDINGS OF FACT

Investigator Hanlin has been an investigator with the NSP for twenty-one years (TR. 4). Investigator Hanlin is primarily involved in the investigation of felonies and misdemeanors in the State of Nebraska, as well as Internet crimes against children (TR. 4). Investigator Hanlin was contacted by Sheriff Kleinberg, who has been with the TCSO for ten years and has been the sheriff for three years (TR. 93, 108). On October 3, 2008, Sheriff Kleinberg told Investigator Hanlin images of concern were found on TCSO Deputy Brandon Cole's laptop computer (TR. 5). Specifically, Sheriff Kleinberg informed Investigator Hanlin images existed on Cole's computer of two local juvenile girls, and Cole had been sending naked pictures of himself to the same juvenile females. **See** Filing No. 27 - [Ex. 3](#) Hanlin Aff. Investigator Hanlin informed Sheriff Kleinberg he would need a couple days to respond to the sheriff to determine how to proceed with the investigation (TR. 6).

Around October 6, 2008, another deputy in the department gave Sheriff Kleinberg a photograph, depicting Cole, in his uniform with his genitals out, which was found on the computer of the deputy's nineteen year old daughter (TR. 81). Sheriff Kleinberg asked Cole to come to the office the next day and, on October 7, 2008, asked Cole if he had sent illicit photos to one of the deputy's daughters (TR. 97). Cole told the sheriff, "No" (TR. 97). Sheriff Kleinberg expressed to Cole he wanted to look at Cole's computer to see if any other pictures existed (TR. 97). Cole responded there was not anything on his computer and the sheriff could look if he wanted (TR. 98). As the day progressed, more allegations emerged regarding other images on the computer (TR. 100-101). Another sergeant deputy sheriff in the department, Sergeant Castillo, had seen images of girls on Cole's computer, approximately twelve to thirteen years of age, one of whom was engaged in sexual intercourse with an adult male (TR. 8-9). Sergeant Castillo, who was one of Cole's roommates, was granted regular access to use Cole's computer (TR. 9).

On October 7, 2008, Sheriff Kleinberg again contacted Investigator Hanlin, who told Sheriff Kleinberg to attempt to get Cole to sign a consent to search form, authorizing TCSO or its designee to view the computer (TR. 9). Fifteen to thirty minutes later, Sheriff Kleinberg contacted Investigator Hanlin to inform him a second desktop computer existed

at Cole's residence (TR. 10).  Investigator Hanlin asked Sheriff Kleinberg if he would allow Deputy Castillo to obtain the desktop computer, along with an additional consent to search form to view the desktop computer (TR. 10).  Sheriff Kleinberg asked Sergeant Perez to acquire two consent to search forms and told her Cole was willing to sign the forms and had already voluntarily given up the laptop computer, which was in the evidence vault at TCSO (TR. 67-68, 101; Exhibits 1, 2).  Sheriff Kleinberg testified Cole was free to go throughout the day (TR. 102-103).  The sheriff also testified he never threatened Cole, promised anything to Cole, or suggested to Cole he would not have a job if he did not consent to the search (TR. 102-103).

After speaking with Sheriff Kleinberg, Sergeant Perez contacted NSP to obtain the proper consent to search forms and proceeded to take the forms to Cole, who was in the deputies' office (TR. 67-69).  Sergeant Perez has been employed with TCSO for eleven years and has been a sergeant in the department for about six years (TR. 61).  As a sergeant, Perez has a disciplinary and supervisory role over the other deputies (TR. 79). Sergeant Perez told Cole, "Brandon, Brandon, Brandon.  We need to get this straightened out.  Are you willing to sign this consent form so they can look at the computer so we can get this whole mess straightened out?"  (TR. 69).  Cole responded, "Yes," and "I haven't done anything wrong" (TR. 69, 71).  Sergeant Perez waited while Cole read the forms, filled in the forms with the computers' serial numbers, and signed the forms (TR. 71, 73, 85). Sergeant Perez testified she did not threaten, make promises, or have any other conversation with Cole except whether he was willing to sign the consent forms to authorize the search of his computers (TR. 70).

Later that day, Investigator Hanlin and two other plain clothes investigators from NSP arrived at TCSO, where they were shown the laptop computer and the consent to search forms for both the desktop and laptop computers (TR. 13).  Investigator Hanlin asked for a room or an area to which he could take the hard drive from Cole's laptop to conduct a preview of its contents (TR. 17).  The NSP investigators were provided a janitor's type closet with a counter and electrical outlets on which to set up the equipment (TR. 17). Investigator Hanlin connected to the computer and, using "En-case" software, was able to preview the contents on Cole's hard drive (TR. 18).  By doing a "gallery view," and looking

for photographs on the hard drive, Investigator Hanlin found images of young girls, anywhere from the ages of three to twelve, which he believed to be child pornography (TR. 18).

Investigator Hanlin then asked to speak to Cole (TR. 19). Cole came into the room where the NSP investigators had been working and remained closest to the exit with his back to the door (TR. 21). Investigator Hanlin advised Cole he was not under arrest, was not charged with anything, and was free to leave, to which Cole responded, "Yes" (TR. 21). Based on previous contact with Cole and what the sheriff had related to him, Investigator Hanlin knew Cole was a deputy sheriff (TR. 22). Investigator Hanlin proceeded to ask Cole questions regarding the images found on the hard drive of his computer (TR. 23). Cole initially said he had no idea from where the images came (TR. 24). Investigator Hanlin told Cole, "We know better, we've seen these investigations before, they just don't miraculously appear on your computer, you have to go out and get them" (TR. 24). Approximately five minutes into the interview, Cole admitted to downloading the images onto his computer and stated "he felt" the images were illegal (TR. 23). Cole admitted he was mass downloading the images from LimeWire (TR. 24). The interview lasted fifteen to twenty minutes (TR. 23). After Investigator Hanlin found the initial images, he obtained a search warrant to conduct a deeper investigation on the computers (TR. 53). At no time did Investigator Hanlin raise his voice, threaten, intimidate, or make misrepresentations or promises to Cole, and Cole was never placed under arrest. (TR. 24-25, 40).

After the interview ended, Investigator Hanlin packed up his equipment, left the room, and proceeded to speak with Sergeant Perez in a different area regarding the course of action for the investigation (TR. 27-28). Cole went to the room where Investigator Hanlin and Sergeants Perez and Castillo were standing and said, "I've got some pictures on my computer that I got over the Internet, but I haven't looked at 'em" (TR. 86). Sergeant Perez asked Cole why he hadn't just "dumped 'em" to which Cole responded he "didn't know" (TR, 74, 86). Sergeant Perez testified Cole appeared a little nervous during this conversation (TR. 88).

Cole has been a deputy sheriff for almost two years with the TCSO (TR. 75). Cole completed the twelve-week training program through the Grand Island training center to

become a deputy sheriff, which includes legal instruction, interrogation, and *Miranda* training (TR. 52).

Cole argues the officers conducted a warrantless search of his computer. **See** Filing No. 21 - Brief p. 2. Furthermore, Cole argues the consent was sought and allegedly obtained by people with supervisory and disciplinary authority over him and, therefore, the consent was invalid. *Id.* at 3; TR. 112. Cole also contends the evidence obtained pursuant to the subsequent search warrant was the fruit of the prior illegal search. *Id.* Cole argues the interview and encounter with NSP Investigators was a custodial interview, therefore, his statements were made involuntarily and *Miranda* should have been administered. *Id.*

## ANALYSIS

### A.   Consent to Search

The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; **see** *United States v. Ameling*, 328 F.3d 443, 447 (8th Cir. 2003) (applying the Fourth Amendment to the states through the Fourteenth Amendment). "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." *United States v. Meza-Gonzales*, 394 F.3d 587, 592 (8th Cir. 2005). The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "voluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. **See** *United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008) (listing factors for voluntariness). "[A] defendant's 'knowledge of his constitutional rights' . . . is a factor in determining voluntariness." *United States v. Gallardo*, 495 F.3d 982, 989 (8th Cir. 2007) (**quoting** *United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006)). A court may also look at environmental factors including the period of time the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations

5

were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred. *Id.* (**citing** *United States v. Saenz*, 474 F.3d. 1132, 1137 (8th Cir. 2007)).

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumber v. North Carolina*, 391 U.S. 543, 548-49 (1968) (footnotes omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). The government bears the burden of proving voluntary consent to search by a preponderance of the evidence. *United States v. Esquivel*, 507 F.3d 1154, 1159-60 (8th Cir. 2007). "An officer does not violate the Fourth Amendment by asking a person for consent to search and waiting for a reply." **See** *United States v. Yang*, 345 F.3d 650, 654 (8th Cir. 2003). It is not required of "an officer to provide *Miranda* warning before requesting consent to search or . . . that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary." *United States v. Payne*, 119 F.3d 637, 643 (8th Cir. 1997).

In the instant case, although Cole's consent was given to his superiors, the atmosphere was not unduly coercive because no evidence exists to show Cole's superiors threatened him, intimidated him, or caused him to rely on any promises or misrepresentations. Cole was never placed under arrest and was free to leave at any time. Cole voluntarily consented to the search, both verbally and in writing, on two separate occasions to two separate officers. Furthermore, Cole was aware of his constitutional rights by virtue of his training in law enforcement, including specific training on consent to search, *Miranda* warnings, and other legal instruction. There was no evidence Cole was under the influence of drugs or alcohol and at no time did Cole revoke his consent for the NSP investigators to look at his computer. During the hearing, the court had an opportunity to observe the demeanor of the three officers. Although the legal analysis is not dependant on a credibility determination, to the extent a credibility determination is needed

the court finds the officers credible. This determination is made based upon each of the witnesses' demeanor during the hearing, intelligence, memory, motives, general reasonableness, and consistency with other testimony. The court finds Cole voluntarily gave consent for the officers to search his computers.

### B. Custodial Interrogation

Cole argues the statements he made to the NSP investigators should be suppressed because the questioning was custodial and, therefore, his *Miranda* rights should have been read to him. Cole asserts the circumstances surrounding his questioning at TCSO rendered such questioning custodial for purposes of *Miranda*. See Filing No. 21 - Brief p. 3. Cole also argues he was subject to "interrogation" absent a valid *Miranda* waiver, rendering his statements involuntary for the purposes of the Fifth Amendment. See Filing No. 20 - Motion p. 2.

The Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004).

> [I]n *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated. To protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

*Patane*, 542 U.S. at 639 (**citing** *United States v. Dickerson*, 530 U.S. 428, 434-35 (2000); *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). "The requirements of *Miranda* arise only when a defendant is both in custody and being interrogated." *United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005).

> Not every confession obtained absent the *Miranda* warnings is inadmissible, however, because "police officers are not required to administer *Miranda* warnings to everyone whom they question. *Miranda* warnings are required only where

7

> there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (**quoting** *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation marks omitted); **see** *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009). The court must evaluate the objective circumstances surrounding the interrogation, and whether, under those circumstances, "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The Eighth Circuit has identified several factors, which act to mitigate or aggravate the custodial atmosphere, to determine whether an interview is custodial, however, "an explicit assertion that the person may end the encounter". . . "provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning." *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006). Some specific factors to evaluate are:

> 1. "whether the police told the suspect he was free to leave, was free to refuse to answer questions, or was not under arrest;"
> 2. "whether the person's movements were unrestrained during the interview;"
> 3. "whether the person either initiated contact with authorities or voluntarily acquiesced to official requests;"
> 4. "whether the police used coercive or deceptive tactics that restricted the suspect's freedom to terminate the encounter;" and
> 5. "whether the questioning occurred in a police-dominated atmosphere.

*Id.* at 1137.

"Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (**quoting**

8

*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). However, "*Miranda* does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer." *United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996) (**quoting** *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989)). The NSP investigators did ask questions of Cole, which may have, and in some cases did, elicit incriminatory responses. Accordingly, the court finds Cole was subject to interrogation on October 7, 2008. However, *Miranda* requires both custody and interrogation.

Cole argues the allegations naturally inspired concern about his employment in the department, and he was subjected to a custodial atmosphere by being put in a small room where three NSP investigators confronted and accused him. However, Cole was not restrained or arrested and was explicitly told he was not charged with anything and he was free to leave. The interview took place in the room where the investigators had set up the equipment, and Cole remained unrestrained and closest to the exit for the entire fifteen to twenty-minute interview. Although three investigators were present, the primary questioning took place by only one investigator. Indeed, the questioning took place in a "police-dominated atmosphere," however, this is due to the nature of the defendant's workplace. Similarly, the evidence shows the investigators did not threaten, intimidate, or make representations or promises to Cole. Furthermore, Cole initiated conversation with Sergeants Castillo and Perez after leaving the interview, stating he had downloaded images onto his computer. Therefore, the court concludes Cole was not in custody and, therefore, the officers were not constitutionally obligated to advise Cole of his *Miranda* rights. Under the circumstances, the court finds Cole's statements on October 7, 2008, were voluntarily given. Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Brandon J. Cole's motion to suppress (Filing No. 20) be denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to these Findings and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served

with a copy of these Findings and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief may be deemed an abandonment of the objection.

DATED this 25th day of August, 2009.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.